**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| TROY CLARK and TAMIRA SMYTH, | |
| Plaintiffs, | |
| v. | |
| P.O. ALBERT D. POWE, #18203, MIGUEL RESTO, MICHAEL ELLIS, JOHN DOE 2-5, DETECTIVE RANDALL BACON, Individually, and the CITY OF CHICAGO, | Case Nos. 07 C 1616 and 07 C 5251 Consolidated. |
| Defendants. | Judge Sharon Johnson Coleman |
| MARCELO GONZALES, | |
| Plaintiff, | |
| v. | |
| P.O. ALBERT D. POWE, #18203, MIGUEL RESTO, MICHAEL ELLIS, JOHN DOE 2-5, DETECTIVE RANDALL BACON, Individually, and the CITY OF CHICAGO, | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Troy Clark, Tamira Smyth, and Marcelo Gonzales filed two complaints alleging various federal and state claims arising from an incident on March 9, 2007, during which plaintiffs allege they were held captive, beaten, and robbed by several individuals including at least one Chicago police officer, Albert Powe. Plaintiffs also allege conspiracy to cover up wrongdoing by police officers against Detective Randall Bacon, the investigating officer. Defendants have filed four motions for summary judgment, which the Court will address in the instant order.

**Background**

The following facts are undisputed unless otherwise noted. In March 2007, Tamira Smyth lived at 1646 N. Bosworth in Chicago, Illinois. Her boyfriend, Troy Clark lived at 4800 S. Lake Park in Chicago, Illinois. Troy Clark uses the nickname "Silk". Marcelo Gonzales worked for Clark as a subcontractor. Gonzales met Clark in February 2007, approximately two weeks before the incident.

On March 9, 2007, Tamira Smyth returned home around 11 am after running errands. When she pulled into her garage, a blue Crown Victoria blocked her in and a man[1] ("Man #1") got out. He was dressed in street clothes and wore a black baseball cap with a police patch on the front. Man #1 came up to Smyth's car window and asked her at gun point to get out of the car. He handcuffed her and told her it was about her friend "Silk." A second man ("Man #2") walked up. Smyth could see a blue and white car, which she believed to be a police car, parked behind the Crown Victoria. The blue and white car left and Man #1 took Smyth up to her apartment.

Inside Smyth's apartment, Man #1 asked her where the drugs and money were and Smyth responded that there were not any in the apartment. Smyth remained handcuffed until she asked to use the restroom. While Smyth was in the bathroom, Man #2 came in and threatened her with a gun. She could hear the two men ransacking her apartment. After coming out of the bathroom, Smyth was bound with duct tape instead of re-handcuffed. Smyth believes Man #2 left her apartment between noon and 1:00 p.m. and that she was alone with Man #1 for one to one and half hours, but she is not sure.

Clark and Gonzales arrived at Smyth's apartment around 5:00 pm. Gonzales waited in the car, while Clark went upstairs. Clark was grabbed, bound with duct tape, and beaten as soon

---

[1] Since the identities of all the perpetrators are not known, this Court has elected to refer to each as "Man" with a numerical designation (ex. Man #1). The perpetrators are numbered sequentially (1 to 4) in the chronological order in which each arrived on the scene and thereafter referred to by their number.

as he entered Smyth's apartment. Two men ("Man #3" and "Man #4") approached Gonzales while he waited in the car. They announced they were police and both had guns. They took Gonzales up to Smyth's apartment where he was blindfolded with duct tape. Gonzales heard Clark being beaten and other noises for over an hour before it went silent.

Smyth overheard Man #2 on his cell phone saying the money might be at another location. Sometime after dark, around 6:30 or 7:00 p.m. Man #2 had Smyth drive her car to Clark's residence at 4800 S. Lake Park. On the way, Smyth overheard Man #2 on the phone saying something about having a police car at Clark's when they arrived. Smyth testified that she thought it was Man #1 on the phone. Smyth saw a police car in front of Clark's building. The security guard let them in and Man #2 had Clark's keys. Man #2 searched Clark's apartment for approximately 30 minutes. Smyth left with Man #2 and returned to her apartment. The police car was still parked in front of Clark's building when they left.

When Smyth and Man #2 arrived back at Smyth's apartment, Clark and Gonzales were still there with Man #3 and Man #4. When Clark heard Smyth and Man #2 return without finding any money, he told the men about the $5000 in his laptop case. Approximately four or five hours passed before Gonzales and Clark were taken out of the apartment and put in car. They were driven for fifteen or twenty minutes. When the car stopped, Clark and Gonzales were taken down to a basement. Clark was beaten again and Gonzales was hit in the head three times with a two-by-four. Gonzales remained blindfolded and could not see who hit him or Clark. Somebody took $800 from Gonzales and then put him in a car trunk for five minutes before letting him go. When Gonzales got out of the trunk he saw Clark injured nearby. They were in an alley and walked out to the street where they were able to call the police and an ambulance. They later learned that they were in Harvey. Gonzales and Clark arrived at the hospital around 1:00 a.m. on

March 10, 2007. Smyth was left alone at her apartment at 8:24 p.m. She called 911 a little after midnight.

Ten days after the incident, Clark and Smyth were interviewed by Federal Bureau of Investigation Special Agents Ashcroft and Samuels. During the interview, Clark told the agents and Detective Randall Bacon of the Chicago Police Department Internal Affairs division that three people, Stan Ellis, his brother Michael Ellis, and Gregory Jackson were capable of carrying out the incident. Clark admitted to the FBI agents and Detective Bacon that he initially thought Smyth could be involved.

Detective Bacon was assigned to investigate because Gonzales had told police that one of the perpetrators announced himself as police. Bacon's investigation was separate and in addition to the criminal investigation conducted by Area 5 detectives. Bacon obtained tracking reports to determine whether any Chicago Police vehicles were in the vicinity of either Smyth's apartment or Clark's at the time of the incident. None were reported. Bacon facilitated a photo array session for Smyth in which she viewed thousands of photos over several hours and viewed two live lineups with her lawyer present. Smyth identified Officer Powe as one of the assailants. Bacon investigated Powe based on Smyth's identification. He determined from dispatch and radio records that Powe worked on March 9, 2007, from 4:00 p.m. to 12:30 a.m. in the same district as 4800 S. Lake Park. Bacon obtained various police records but none provided any information to verify the presence of police personnel. Bacon also obtained sergeant's logs from Powe's district and visited 4800 S. Lake Park to get any surveillance video. Bacon reviewed Powe's arrest history and found no connection to plaintiffs. Bacon also requested name search reports to find any potential links. Bacon subpoenaed Powe's cell phone and direct connect ("chirp") telephone records to identify callers. Bacon had the Illinois State Police Crime lab

-4-

analyze physical evidence from Smyth against Powe's DNA and fingerprints. No match was found. The analysis performed by the Illinois State Police did reveal a match to Miguel Resto. Clark and Gonzales also identified Resto from a lineup facilitated by Bacon. Powe gave a statement and was interviewed by Detective Bacon. He provided an alibi, stating that he was working on his mother's bathroom with help from Leslie Irving prior to his 4:00 p.m. shift on March 9, 2007. Bacon spoke to Leslie Irving to confirm the alibi. Bacon recommended to his superiors that the charge not be sustained because there was a lack of evidence tying Powe to the incident.

In his deposition, Clark claimed that Bacon failed to pursue certain steps that amounted to abandoning the investigation, including failing to check tower records on Powe's cell phone, holing back Powe's phone records for two years, and failing to interview Stan Ellis, Gregory Jackson or Mike Ellis. Neither Stan nor Mike Ellis nor Gregory Jackson is Chicago Police Officers.

**Legal Standard**

A party is entitled to summary judgment if all of "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a summary judgment motion, the Court construes the facts and all reasonable inferences in the light most favorable to the non-moving party. Abdullahi v. City of Madison, 423 F. 3d 763, 773 (7th Cir. 2005). The party who bears the burden of proof on an issue may not rest on the pleadings or mere speculation, but must affirmatively demonstrate that there is a genuine issue of material fact that requires a trial to resolve. Celotex v. Catrett, 477 U.S. 317, 324 (1986).

**Discussion**

*1. The City of Chicago*

The City of Chicago moves for summary judgment on the basis that no reasonable jury could find that any of the alleged actions committed by Powe are within the scope of his employment as a police officer, thus it is not required to indemnify Powe and any claims based on *respondeat superior* must fail. This Court disagrees.

Pursuant to the Local Government Tort Immunity Act, a municipality is required to pay for compensatory damages awarded for torts committed willfully and wantonly by a municipal employee acting within the scope of his employment. 745 ILCS 10/9-102. Summary judgment is generally inappropriate when scope of employment is at issue. *Pyne v. Witmer*, 129 Ill. 2d 351, 359 (Ill. 1989). A court should grant summary judgment only if no reasonable person could conclude from the evidence that an employee was acting within the scope of his employment. *Id.* The term "scope of employment," has no precise definition, but generally courts apply the following broad criteria: "(1) Conduct of a servant is within the scope of employment if, but only if: (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; (c) it is actuated, at least in part, by a purpose to serve the master, (2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master." *Id.* at 360.

Here, although there is considerable evidence in the record that could support an inference that the defendants were involved in criminal activity that would certainly be beyond the scope of employment for a police officer, there are also facts that could reasonably be interpreted by a jury as conduct within the scope of employment. Police officers have a variety

of duties including, conducting searches, looking for drugs, carrying weapons, and giving orders. The Seventh Circuit has repeatedly warned against resolving indemnity before liability. *See, e.g., Doe v. City of Chicago*, 360 F.3d 667, 672 (7th Cir. 2004). Finding that in the light most favorable to plaintiffs fact issues exist appropriate for resolution by a jury, this Court denies summary judgment to the City of Chicago.

*2. Officer Albert D. Powe*

Powe filed two motions for summary judgment (one on Clark and Smyth's complaint and the other on Gonzales' complaint) asserting that none of the alleged conduct could reasonably be construed as "under color of law," which is a necessary element to sustain a section 1983 civil rights claim. Traditionally, courts have held that a defendant acts under the color of law when he exercises power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *United States v. Classic*, 313 U.S. 299, 326 (1941). The question of whether a police officer acted under color of law is not answered by whether the officer was on duty. Nor is the presence or absence of a uniform, patrol car, badge or gun, dispositive of the issue. Here, there are ample facts from which a jury could conclude that Powe was acting under color of law. Smyth testified that Powe exited a blue Crown Victoria, wore a baseball hat with a police patch, and carried a gun and handcuffs. Smyth also testified that she saw a blue and white car parked behind the Crown Victoria that she believed was a police car. Powe ordered her to exit her vehicle, handcuffed her, and searched her residence. Accordingly, Powe's motions are denied.

*3. Detective Randall Bacon*

Bacon moves for summary judgment on the basis that there is no evidence of a conspiracy, there is no constitutionally protected right to an investigation of a certain quality,

and Bacon has qualified immunity from suit. Count X of Clark and Smyth's Ninth Amended Complaint and Count IX of Gonzales' Fourth Amended Complaint allege conspiracy to violate due process against Detective Randall Bacon.

The right of individuals to seek legal redress for claims that have a basis in law and fact is protected by the First and Fourteenth Amendments to the U.S. Constitution. *See Bill Johnson's Restaurants v. NLRB*, 461 U.S. 731, 741 (1983). The conduct of state actors to impede an individual's access to courts may give rise to a civil rights claim pursuant to section 1983 of the Civil Rights Act of 1964. *See Vasquez v. Hernandez,* 60 F.3d 325, 328 (7th Cir. 1995). "Judicial access must be 'adequate, effective, and meaningful,' and therefore, when police officers conceal or obscure important facts about a crime from its victims rendering hollow the right to seek redress, constitutional rights are undoubtedly abridged." *Id.* (quoting *Bounds v. Smith,* 430 U.S. 817, 822 (1977)).

Here, to the extent that plaintiffs' conspiracy claim rests on allegations that Detective Bacon failed to fully investigate the incident, that claim must fail because the Seventh Circuit does not recognize a claim for "inadequate police investigatory work" in the absence of some other recognized constitutional violation. *See Lyons v. Adams*, 257 F.Supp.2d 1125, 1135 (N.D. Ill. 2003)(collecting cases). Moreover, there is no evidence to show that Bacon's conduct caused plaintiffs to be denied access to the courts or in any way prevented from suing. Additionally, there is no evidence in the record to show that Bacon was engaged in a conspiracy. It is undisputed that Detective Bacon was conducting an internal affairs investigation and that it was separate and distinct from the criminal investigation into the incident conducted by other officers. Thus, any allegations that Bacon failed to interview or follow up with civilians identified by plaintiffs as potentially being involved does not support an inference that he

actively concealed information by agreement with some unknown other officers. To find otherwise would be pure speculation.

Even assuming *arguendo* that Bacon did not conduct a thorough investigation, he would be immune from suit under the qualified immunity of a public employee carrying out his law enforcement duties. "A public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 ILCS 10/2-202. There is no evidence in the record to support even an inference that Bacon's failure to interview individuals named by plaintiffs as potentially involved or failing to request the cell phone tower records for Powe's phone constituted willful and wanton conduct. Accordingly, Bacon's motion is granted.

**Conclusion**

For the reasons stated above, the Court denies the City of Chicago's motion for summary judgment [318]. The Court also denies Powe's motions for summary judgment against Clark [322] and Gonzales [87]. Detective Bacon's motion for summary judgment [314] is granted. Status hearing set for Monday, January 9, 2012, at 9:00 a.m.

IT IS SO ORDERED.

Date: January 3, 2012

Entered:_____
Sharon Johnson Coleman